489 S.E.2d 7

**Bobby Gene NUGEN, Administrator of the Estate of Henry Everette Nugen, Plaintiff Below, Appellant**

v.

**Garland J. SIMMONS, Defendant Below, Appellee**

No. 23609.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 21, 1997.

Decided June 10, 1997.

---

D. Clinton Gallagher, Fayetteville, for Appellant.

Fred A. Jesser III, Fayetteville, for Appellee.

PER CURIAM.

This is an appeal by Bobby Gene Nugen, as administrator of the Estate of Henry Everette Nugen, from an order granting summary judgment in favor of Garland J. Simmons, the decedent's nephew and the Appellee in this case, in a suit to make the proceeds of a joint bank account part of Henry Nugen's estate. The Appellant, who in addition to being the administrator is one of the decedent's three sons, claims that there were genuine issues of material fact in the case, and that summary judgment was therefore improper. After reviewing the record and the submissions of counsel, we disagree, and affirm the judgment of the Circuit Court of Fayette County.

Henry Nugen died testate on November 4, 1993. He had three sons, one of whom, Bobby Gene Nugen, was appointed administrator of the estate. Henry Nugen was ninety-one years old at the time of his death, and had lived with his nephew, Garland Simmons, for his last two or three months. Mr. Nugen had black lung and other health problems, and had been in and out of the hospital several times. In August, 1993, his sons, who had been sharing the care of their father, took him to visit two nursing homes. Mr. Nugen indicated to them that he would prefer to stay in his own home. Soon thereafter, he called his nephew, Garland Simmons, and asked whether he could move in with Simmons. Mr. Simmons had offered his uncle a room after an illness three years earlier, which Mr. Nugen had declined. This time, Simmons conferred with his wife, and Henry Nugen moved in the next day. Mr. Nugen offered to pay for his room and board, and gave Simmons $1,200 per month for two months before he died.

According to Mr. Simmons, soon after moving in, Mr. Nugen asked to go to the bank to get the deed to his house. While there, removed everything from his safe deposit box, and returned it all two days later. On August 27, 1993, after putting everything back into the safe deposit box, Simmons stated in his deposition that the decedent commented to him that "the boys" had been in the box and there was some money missing. The decedent's son, Albert, had signed the card indicating that he had used the box. Henry Nugen then said that he would transfer everything into Mr. Simmons's name, and proceeded to open a new joint account and transfer into it over $70,000 that had been in an account held jointly with his son, Albert.

When Henry Nugen died on November 4, 1993, there was a balance of $74,408.56 in the joint account. Donald Nugen, another son, went to Mr. Simmons' house and asked for the money. Simmons refused. On December 17, 1993, Bobby Gene Nugen, as administrator, filed suit to recover the money, alleging that it was the rightful property of the Estate of Henry Nugen. In response to a motion for a more definite statement, the estate filed an amended complaint on January 12, 1994, alleging that the decedent and Simmons had a contractual agreement for

tending to the decedent's personal needs, and that it had been the decedent's intent to establish the joint account for convenience in paying his bills, and not to make a gift of the funds. On April 18, 1994, the Appellee moved for summary judgment on the basis of West Virginia Code section 31A–4–33 (1996), which creates a presumption that the donor-depositor of a joint bank account intended a gift of the proceeds remaining in the account at his death to the surviving joint tenant. The Appellee supported this motion with the signature card indicating a joint account, and the affidavits of three bank employees who witnessed the creation of the account.

The affidavits of Becky Booth and Diana Janney are identical. Both say that Henry Nugen and Garland Simmons appeared together on August 27, 1993, to transfer an account from Henry Nugen to "Henry Nugen or Garland Simmons," and

That she personally informed Mr. Henry Nugen that by opening this account Mr. Garland Simmons, upon the death of Henry Nugen, would receive all the proceeds of the account and in fact could withdraw the account at any time if the said Garland Simmons so wished.

That Henry Nugen appeared to understand his actions and to further understand the result of his actions as explained to him by the undersigned.

The affidavit of a third bank employee, Harriet Woodson, states that she witnessed Becky Booth explain the consequences of the joint account to the decedent.

The circuit court denied the motion for summary judgment by order dated June 29, 1994, and stated in a supporting letter to counsel that the allegation of a contractual relationship and a relationship of convenience between the Appellee and the decedent precluded a finding that there was no issue of material fact in the case. On February 16, 1995, following depositions, the Appellee renewed his motion for summary judgment. On April 17, 1995, the circuit court granted summary judgment for Garland Simmons, indicating that it relied on the uncontroverted affidavits of the three bank employees to determine that there was no genuine issue of material fact.

It is from this ruling that the administrator appeals. The Appellant asserts that there were genuine issues of material fact with respect to whether a confidential or fiduciary relationship existed between the decedent and Simmons; and whether the creation of the joint account was due to fraud, mistake, or undue influence.

 Our review of summary judgment is de novo. Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). We will uphold the grant of summary judgment only if there is no genuine issue as to any material fact. Syl. Pt. 4, *Aetna Casualty & Sur. Co. v. Federal Ins. Co.*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

 Our starting point is West Virginia Code section 31A–4–33(b) (1996), which provides:

When a deposit is made by any person in the name of such depositor and another or others and in form to be paid to any one of such depositors, or the survivor or survivors of them, such deposit, and any additions thereto, made by any of such persons, upon the making thereof, shall become the property of such persons as joint tenants. All such deposits, together with all interest thereon, shall be held for the exclusive use of the persons so named, and may be paid to any one of them during the lifetime of them, or to the survivor or survivors after the death of any of them.

In syllabus point 2 of *Dorsey v. Short*, 157 W.Va. 866, 205 S.E.2d 687 (1974), this Court held:

Code, 1931, 31A–4–33 as amended, creates, in the absence of fraud, mistake or other equally serious fault, a conclusive presumption that the donor depositor of a joint and survivorship bank account intended a causa mortis gift of the proceeds remaining in the account after his death to the surviving joint tenant.

Thus we begin with the presumption that Henry Nugen intended to make a gift of the money remaining in the joint account to Garland Simmons. In syllabus point 2 of *Lutz v. Orinick*, 184 W.Va. 531, 401 S.E.2d 464

(1990), the Court clarified the burden of proof necessary to defeat this presumption:

> A party seeking to prove fraud, mistake or other equally serious fault must do so by clear and convincing evidence and if such fraud, mistake or other equally serious fault is not so proven, then the surviving joint tenant may rely on the conclusive presumption created by *W.VA.CODE*, 31A–4–33, as amended, that the donor depositor of a joint and survivorship account intended a causa mortis gift of the proceeds remaining in the account after his death to the surviving joint tenant to establish such gift.

The Appellant, therefore, can overcome the presumption of a gift by proving by clear and convicting evidence that the money was placed in the joint account with Mr. Simmons as a result of fraud, mistake, or other equally serious fault.

■ With regard to proving fraud in such circumstances, this Court held in the syllabus of *Kanawha Valley Bank v. Friend*, 162 W.Va. 925, 253 S.E.2d 528 (1979):

> A presumption of constructive fraud may arise in connection with joint bank accounts with survivorship, if the parties to the joint account occupy a fiduciary or confidential relationship. This presumption requires the person who benefits from the creation of the account to bear the burden of proving that the funds were, in fact a *bona fide* gift.

If, therefore, Mr. Simmons had a fiduciary or confidential relationship with the decedent, the law implies fraud, and the burden of proof shifts to the Mr. Simmons to show that the decedent intended to make a gift.

■ It is important to note that a party seeking to invoke constructive fraud under *Friend* must show not only that a confidential or fiduciary relationship existed, but also that the fiduciary used the relationship to direct property into the joint tenancy. In *Vance v. Vance*, 192 W.Va. 121, 451 S.E.2d 422 (1994), for example, the decedent's nephew had lived with the decedent during her last years, and she had named him executor of her estate and given him a power of attorney. Prior to her death, the decedent transferred securities from her own name to herself and her nephew as joint tenants with right of survivorship. When the decedent died, the estate sued to recover the jointly held securities, citing *Kanawha Valley Bank v. Friend*. In affirming the circuit court's grant of summary judgment for the bank, this Court emphasized the fact that the decedent had made the transfers herself, and noted that the appellants had introduced nothing to counter an affidavit by the nephew that he did not use his fiduciary relationship with the decedent to cause the transfers. 192 W.Va. at 124, 451 S.E.2d at 425. Thus although the joint tenant clearly occupied a fiduciary relationship with respect to the decedent by being her executor and holding her power of attorney, the Court implied no constructive fraud in the absence of evidence that the fiduciary caused the transfers to joint tenancy.

The case before us presents first the issue of whether a fiduciary or confidential relationship existed. This Court's decision in *Smith v. Smith*, 168 W.Va. 511, 285 S.E.2d 145 (1981), is instructive on this issue. There, the appellant had performed a number of services for the decedent, such as doing laundry and driving the decedent from place to place. Significantly, there was also evidence showing that the appellant's name was placed on the joint account to afford her access to the funds in the event that the decedent got sick. *Id.* at 512, 285 S.E.2d at 146. On appeal, this Court found that the appellant did not stand in a fiduciary relationship to the deceased, noting that she held no document giving her control over the decedent's general financial affairs, and that there had been no showing that the surviving joint tenant had ever assumed possession or control over the decedent's assets. The Court determined that the lower court had erred in refusing to apply the conclusive presumption of a gift. *Id.* at 514–15, 285 S.E.2d at 147.

■ The Appellant urges the Court to find that Garland Simmons occupied a fiduciary or confidential relationship with respect to the decedent. In support of this assertion, he states that Simmons had invited Henry Nugen to live with him three years previous-

ly; that Simmons and Henry Nugen had been meeting for coffee six days a week for six or seven years before Mr. Nugen's death, and that Simmons said in his deposition that he was looking out for the decedent's interests as well as his health. None of these facts gives rise to the kind of fiduciary relationship contemplated by the Court in *Kanawha Valley Bank v. Friend.* There, the Court discussed several fiduciary relationships, including that created by a power of attorney, a partnership, a declaration of trust which provided for equal sharing in profits from the sale of certain lands, and the attorney-client relationship. 162 W.Va. at 928–30, 253 S.E.2d at 530–31.[1] The Appellant offers no support for finding a fiduciary relationship based only on facts indicating a friendly or familial relationship.

■ More importantly, there was no evidence in the record that Mr. Simmons used whatever relationship he occupied with respect to Mr. Nugen to influence the decedent's decision to place the funds in the disputed joint account. The uncontroverted statements by three bank employees are all to the effect that Mr. Nugen made the transfer himself, that the legal consequences of the transfer were fully explained to him, and that he appeared to understand and assented to those consequences. In such circumstances, the circuit court found no fiduciary relationship between the Appellee and the decedent in this case giving rise to a presumption of constructive fraud.

In the alternative, the Appellant asserts that there was a genuine issue of material fact with regard to Henry Nugen's intent when he created the joint account with Garland Simmons, and specifically with respect to whether the creation of the joint account resulted from a mistake on the part of the decedent. Two of the sons said in depositions that their father had referred to Simmons as a crook or a thief, and that their father told them he had transferred the money for convenience, because he was living with Simmons. Simmons, on the other hand,

said in his deposition that the decedent told him on more than one occasion that the money was a gift, and often said things like, "When I'm gone, you can have this—you can have that," such as a new car.

■ The Appellant would bear the burden of proving a mistake by clear and convincing evidence. *Lutz v. Orinick,* 184 W.Va. 531, 401 S.E.2d 464 (1990). The Appellant states in his petition that he does not quarrel with the facts set forth in the bank employees' affidavits, but nevertheless disputes whether the decedent understood the nature of the transaction. As we recognized in syllabus point four of *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994), "[s]ummary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove." Absent any evidence to the contrary, the affidavits in this case are compelling evidence indicating that the decedent was informed and understood the consequences of his actions. We therefore find no error in the circuit court's conclusion that there was no material issue of fact with respect to mistake.

It is the opinion of this Court that the judgment of the circuit court should be affirmed.

Affirmed.

STARCHER, Justice, dissenting:

Certain types of cases are especially ill-suited for resolution by summary judgment. Contests over transfers of substantial sums of money to caretakers by elderly people, especially just before their death, are in this category. Accordingly, I dissent.

As I read it, the evidence in the depositions and affidavits which were submitted to the trial court in this matter on balance tended to show that the senior Mr. Nugen intended to make a gift to Mr. Simmons of

---

**1.** The cases cited by the Appellant in support of this argument, *Smallridge v. Sipe,* 185 W.Va. 135, 405 S.E.2d 465 (1991) and *Kanawha Valley Bank v. Friend,* 162 W.Va. 925, 253 S.E.2d 528 (1979), both involve a power of attorney evidencing a fiduciary relationship. There was none in this case.

the money in the joint account—some $74,000. So why should Mr. Simmons have to go through a trial in order to keep the money?

There is one reason this case should have been tried, and that reason is easy to understand; indeed most of us learned it as children. It is the application of the Golden Rule: "Do unto others as you would have others do unto you." [1]

If the shoe had been on the other foot, and Mr. Nugen's sons were claiming that Mr. Simmons' father had given most of his money to them—then I think that Mr. Simmons would feel that *he* had a right to a trial to try to show that Mr. Simmons' father didn't really mean to give his money to the Nugen boys. Applying the Golden Rule, Mr. Nugen's sons should be afforded the same right to a trial that Mr. Simmons would claim.

The result that the Golden Rule dictates is also supported by settled legal principles—also fairly easy to understand—which strongly suggest that this case should not have been disposed of on summary judgment.

Under *Kanawha Valley Bank v. Friend,* 162 W.Va. 925, 253 S.E.2d 528 (1979), if the relationship between the senior Mr. Nugen and Mr. Simmons was a *confidential* relationship—that is, a relationship in which one person trusts and reposes confidence in another, *see Marshall v. Marshall,* 166 W.Va. 304, 307, 273 S.E.2d 360, 362–63 (1980)—then the burden would shift to Mr. Simmons to prove that the elder Mr. Nugen intended to make a gift.

Whether there was a confidential relationship is a question of fact. This Court has stated that it *"is a question of fact for the jury* to initially resolve as to whether the plaintiff proved that a confidential or fiduciary relationship existed.... the burden of proof ... shifted ... only if this initial question was resolved in plaintiff's favor." *Dillon v. Dillon,* 178 W.Va. 531, 362 S.E.2d 759 (1987) (per curiam) (emphasis added).

Mr. Simmons repeatedly acknowledged that he was taking care of Mr. Nugen and "looking out for" Mr. Nugen and handling "his affairs." There can be no doubt that

there was enough evidence to create a genuine issue of fact for the jury as to whether a confidential relationship existed.

In my mind, there is little question as to whether such a confidential relationship existed. Of course it did. It is precisely because Mr. Nugen reposed a high degree of trust and confidence in Mr. Simmons that he entrusted Mr. Simmons with the power to write checks on his bank account.

If a jury had agreed there was a confidential relationship, then Mr. Simmons would have had the burden of proving by a preponderance of the evidence that the elder Mr. Nugen intended to make a gift to Mr. Simmons. It is my impression that such proof was well within Mr. Simmons' grasp, if all went well for him at trial.

On the other hand, if a jury had disagreed with my impression and had found that there was no confidential relationship, then the burden would have been on the Nugen sons to rebut the presumption of a *causa mortis* gift which is established in *W.Va.Code,* 31A–4–33 [1994], a rebuttal which would may been difficult but not inconceivable, depending on how the trial went.

Either way the burden lay, a jury's ultimate determination would certainly depend on the demeanor of the witnesses and the cumulative consistency and weight of the testimony on both sides. Would Mr. Simmons come across at trial as a shifty opportunist, or as a decently motivated person? Would the bank employees' several stories have troubling inconsistencies, and would they concede under cross-examination that the senior Mr. Nugen was somewhat confused when he put Mr. Simmons' name on the bank account? Or would the bank employees appear to be solid citizens who had carefully advised a man of sound mind who well knew what he was doing? Would the Nugen sons be believable when they said that their father had called Mr. Simmons a crook? Or would they appear to be lying because their father had chosen someone else to give his money to?

---

**1.** *Familiar Quotations,* John Bartlett (E.M. Beck, Ed.) (1980) suggests that this standard of morality has endured the ages. *See Bartlett's,* St. Matthew, 38:14; Confucius, 69:14; Aristotle, 87:3.

Obviously, these are matters which can only be determined at trial, not in summary judgment. As I have noted, I have an impression as to where the truth probably lies in this case—but it is only an impression, and it is based on a few depositions and affidavits. If the parties had waived a jury trial and I were the trial judge, I would never decide such a case on a paper record—I would insist on hearing testimony so I could observe the demeanor of the witnesses and decide whom to believe.

In a case addressing the exact same issue as the instant case, *Koontz v. Long,* 181 W.Va. 800, 803, 384 S.E.2d 837, 840 (1989) (*per curiam*), the trial judge did what I think was the proper thing to do. The judge submitted the case to the jury with correct instructions, and this Court upheld the jury's verdict, saying:

> It is the peculiar and exclusive province of the jury to weigh the evidence and resolve questions of fact when the testimony of witnesses is conflicting or when the facts, though undisputed, are such that reasonable men may draw different conclusions from them. (Citations omitted).

In a recent opinion, *Barnhart v. Redd,* 196 W.Va. 142, 469 S.E.2d 1 (1996) (Per Curiam), we recognized the important role of the jury in such cases.[2]

Put another way, although the burden can go different ways, the issue in this case is ultimately the senior Mr. Nugen's intent. And intent is almost always an issue of fact. For example, "[w]hether there has been a delivery of a deed *is a question of fact rather than of law depending upon the intent* of the grantor to vest an estate in the grantee." Syllabus point 2, *Garrett v. Goff,* 61 W.Va. 221, 56 S.E. 351 (1907) (emphasis added).

If at the end of the evidence or even after a jury reached a verdict the trial judge had the firm conviction that there was no evidence upon which a reasonable jury could base a decision for Mr. Nugen's sons, or alternatively for Mr. Simmons, the court could direct a verdict, or set aside a verdict that is clearly improper. But that result would occur *after* the judge and the jury have had the benefit of live testimony—which I hope that this dissent has shown could make a real difference in the outcome in this case.

Finally, this case prompts me to briefly comment on the dangers of reliance upon summary judgment to resolve issues that are best or necessarily left to a jury.

One danger is that the outcome of a summary judgment motion may be determined not by the merits of the case, but the quality and quantity of the lawyering. For various reasons, it is a real possibility and not an uncommon occurrence that the lawyers for one side, or even for both sides, will not do a top-notch job in the pre-trial phase of litigation. Expensive depositions may be avoided, affidavits may be unartfully drawn, witnesses may not be tracked down, all of the issues involved may not be identified, and the briefs may be scantly researched and written. As a result, a case may be shot down in a summary judgment proceeding—*not because of the merits of the case*—but because of the lawyering that preceded the summary judgment determination.

Second, in summary judgment, a court is using a relatively complex and refined mechanism that depends on juggling many evidentiary and legal issues at the same time. The pressures of a trial judge's time-constrained

---

**2.** *Barnhart,* 196 W.Va. at 146, 469 S.E.2d at 5, stated:

> *Vercellotti v. Bowen,* 179 W.Va. 650, 371 S.E.2d 371 (1988) (*per curiam*) (finding sufficient evidence for a *jury* to conclude that a confidential relationship existed between a mother and daughter in which the mother was aged, ill, isolated and had limited ability in the English language); *Koontz v. Long,* 181 W.Va. 800, 384 S.E.2d 837 (1989) (*per curiam*) (finding sufficient evidence for a *jury* to conclude the existence of a fiduciary relationship); *Yaromey v. King,* 182 W.Va. 126, 386 S.E.2d 493 (1989) (*per curiam*) (finding sufficient evidence of a fiduciary relationship to instruct the *jury* on fiduciary duties and presumption of constructive fraud); *Smallridge v. Sipe,* 185 W.Va. 135, 405 S.E.2d 465 (1991) (*per curiam*) (finding summary judgment improper because of a *factual question concerning whether a confidential relationship existed*); *Webb v. Williams,* 188 W.Va. 7, 422 S.E.2d 484 (1992) (*per curiam*) (finding the record sufficient to support a *jury* finding of clear and convincing evidence of a mistake to rebut the presumption of W.Va. Code 31A-4-33).

schedule often make this sort of balancing act difficult. As a result—and in this job of appellate review we see this result—*the rulings in summary judgment may well be wrong;* not because the judge is inept, but because the format of summary judgment is over-prone to judicial error.

The format of a trial tends to reduce both of these problems. First, at trial, the lawyering makes less of a difference. The witnesses, the evidence and the true legal issues in the case come directly before the court without being entirely mediated through a lawyer's efforts. As a geologist I know says: "Never rely on maps—get out on the ground!" At trial, the likelihood that the *true* merits of the opposing sides' contentions will be considered is significantly greater.

Also, I think the judging is better in the trial format. At trial a judge generally deals with issues one at a time, out loud, on the record, with instantaneous feedback from counsel. Instead of trying to address a complex picture of issues all at one time and deriving the picture entirely from a set of briefs, trial allows the court to consider the issues one at a time, and the issues are presented in a more tangible fashion. This is easier and I think it gives better results. The impressive results I have already seen in the trial records before me from many of our circuit courts bear out this impression.

Simply put, trial forces a judge to look at and absorb the facts and evidence and issues, whether the judge wants to or not. Trial vastly enhances a judge's understanding of the case.

Finally, a trial gives citizens their day in court, typically before a jury of their peers; this promotes public confidence in the judicial process. While no one likes to lose in court, I have been amazed at how the most adverse verdicts have been accepted by litigants when they were rendered after a jury trial, when the same ruling without a trial would have been forever seen as corrupt.

For the foregoing reasons, I would reverse the circuit court's grant of summary judgment and remand the case for trial.